UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Civil Action No. 5:20-cv-00507-D

| | | |
|---|---|---|
| TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives, PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate, BOBBY HEATH, MAXINE WHITLEY, and ALAN SWAIN, | ) ) ) ) ) ) ) | |
| Plaintiffs, v. | ) ) ) ) | **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER [D.E. 8]** |
| DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections, STELLA ANDERSON, in her official capacity as a member of the North Carolina State Board of Elections, JEFF CARMON, III, in his official capacity as a member of the North Carolina State Board of Elections, and KAREN BRINSON BELL, in her official capacity as the Executive Director of the North Carolina State Board of Elections, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## INTRODUCTION

Plaintiffs—Republican legislators, candidates, and voters—invite this Court to wade into their attack on the State Board of Elections, seeking to undermine the Board's unanimous bipartisan decision—reached after full and lengthy consideration and debate—to make a few modest accommodations to voters to resolve a string of good-faith legal challenges arising from the unparalleled circumstance of having to conduct an election amid a global pandemic.

As detailed below, the Court would have to go to truly extraordinary lengths to accept plaintiffs' invitation. Among other things, it would have to disregard numerous procedural and jurisdictional hurdles and the principles that underlie them, rule on multiple issues of North Carolina law that are currently pending before a North Carolina court, and displace the State Board of Elections as the body that is legislatively authorized to decide how best to harmonize necessary adjustments to state elections procedures with state law under exigent circumstances.

Accepting plaintiffs' invitation would also prolong the uncertainty that voters and election administrators face. Ending that uncertainty, and doing so in a way that honors the intent and purpose of North Carolina's elections statutes, while avoiding the much more far-reaching measures that plaintiffs in state and federal litigation have sought, are the precise reasons why the State Board decided to enter into the proposed consent judgment currently pending before a North Carolina court.

That proposed consent judgment makes three modest changes to procedures to be employed for this year's elections: (1) fulfilling the purpose of the witness requirement by allowing voters to cure deficiencies in their own absentee ballots by attesting that they, in fact, marked the ballot; (2) extending by a few days the deadline for receipt of absentee ballots that are postmarked by Election Day, to match the deadline for overseas ballots and accommodate the U.S. Postal Service's warning that more time is needed because of this year's unprecedented strain on the postal system; and (3) requiring individuals who return absentee ballots in person to attest verbally to an elections official (who then logs the attestation), rather than on a written log, that they are either the voter or a near relative and therefore are legally authorized to deliver the ballot. No statutes are being ignored. No policies are being overwritten.

As the State Board unanimously concluded, making these accommodations is not only authorized by State law, it is also a good outcome for the State. Under the agreement, the plaintiffs will withdraw multiple other requests, including further expanding early voting, eliminating the witness rule and postmark requirement altogether, and allowing for unsupervised absentee-ballot drop-boxes. The State Board rejected all of those demands, and believes they would be ill-advised for numerous reasons. Impeding entry of the consent judgment would risk reviving those claims. This Court should not accept plaintiffs' invitation to interpret state law on the flimsy bases they press here.

## STATEMENT OF FACTS

**A.      North Carolina's Absentee-Ballot Restrictions.**

North Carolina has a statutory scheme that is designed to limit absentee-ballot fraud:

- Prohibition against anyone other than the voter or the voter's near relative or guardian making an absentee ballot request, N.C. Gen. Stat. § 163-230.2(a);

- Prohibition against anyone other than the voter, the voter's near relative or guardian, or member of a multipartisan assistance team returning in person an absentee ballot request, N.C. Gen. Stat. § 163-230.2(e);

- Prohibition against anyone other than the voter or the voter's near relative or guardian returning a marked absentee ballot in person, N.C. Gen. Stat. § 163-226.3(a)(5)

- Administrative rule requiring a person returning an absentee ballot in person to provide identifying information in writing and certifying that the person returning the ballot is the voter or voter's near relative or guardian, 08 NCAC 18. 0102. The rule--which became effective in December 2018--states that county boards of elections "may consider the delivery of a ballot in accordance with this rule in conjunction with other evidence in determining whether the container-return envelope has been properly executed" and that "[f]ailure to comply with this Rule shall not constitute evidence sufficient in and of itself to establish that the voter did not lawfully vote his or her ballot." *Id.*

- Witness certification requirement that confirms that the voter marked the ballot or caused it to be marked in the voter's presence.

**B.** **COVID-19 and the Global Pandemic**

The effects of COVID-19, both on public health and on a wide variety of activities are, by now, well-known. The COVID-19 pandemic has been widely recognized as the greatest global health crisis in at least a century. In our State alone, aAt least 207,380 people in North Carolina have had laboratory-confirmed cases of COVID-19 and at least 3,441 have died from the virus. *See* https://covid19.ncdhhs.gov/, accessed Sept. 27, 2020.

On March 25, 2020, the President of the United States issued a declaration of disaster for the State as a result of the COVID-19 pandemic. This disaster declaration is still in place.

**C.** **Remedial Actions by the State Board of Elections**

On March 20, 2020, the Executive Director instituted a temporary and permanent rulemaking process to amend the rule governing the use of her emergency powers under section 163-27.1. The rule at the time allowed the Executive Director to exercise her emergency powers in response to a catastrophe resulting in a disaster declaration by the President of the United States. But because the President had not yet issued a declaration of disaster, the Executive Director had to seek a rule change to allow her to reschedule the Republican second primary in Congressional District 11 from May 12 to June 23. Ex. A. The Rules Review Commission, in a summary opinion, declined to make the rule change permanent. Contrary to the Legislators' allegations, the rule change was not a "power grab" (Br. at 3) but an attempt to allow *members of the Legislators' own party* to choose their nominees under safe conditions.

On March 26, 2020, the Executive Director sent a letter to the North Carolina General Assembly and the Governor to address the issues raised by COVID-19, including *inter alia*, permitting postage to be pre-paid for absentee ballots and reducing or eliminating the witness requirement for elections conducted in 2020.

And finally, on July 17, 2020, the Executive Director issued an emergency order requiring county boards of elections to have minimum weekend hours, minimum number of sites in proportion to

4

registered voter population, and minimum sanitation and hygiene standards. Ex. B. Because the

President's disaster declaration was in effect, the Executive Director did not need to request a rule change

to do so. This emergency order remains unchallenged.

### D. The Enactment of Session Law 2020-17

On June 11, N.C. Sess. Law 2020-17 went into effect. This law made a number of changes in

response to the COVID-19 pandemic, including: reducing the requirement of having two witnesses for

absentee ballots to one witness and providing for absentee ballot requests to be made online. 2020 N.C.

Sess. Laws 17, §§ 1.(a), 7.(a).

### E. United States Postal Service Delays

On July 30, 2020, Thomas J. Marshall, General Counsel of the United States Postal Service wrote

North Carolina's Secretary of State, warning that North Carolina elections law relating to absentee ballot

deadlines was "incongruous with the Postal Service's delivery standards." *Pennsylvania v. DeJoy*, No.

2:20-cv-04096 (E.D.P.A.), Dkt. 1-1 at 53-55. USPS stated that "there is a significant risk" that "ballots

may be requested in a manner that is consistent with your election rules and returned promptly, and yet

not be returned on time or be counted." *Id.* IUSPS recommended that elections officials "allow 1 week

for delivery to voters" and that civilian voters "should generally mail their completed ballots at least one

week before the state's due date. In states that allow mail-in ballots to be counted if they are *both*

postmarked by Election Day *and* received by election officials by a specific date that is less than a week

after Election Day, voters should mail their ballots at least one week before they must be received by

election officials." *Id.* Accordingly, North Carolina voters can postmark their ballot by Election Day, but

because of USPS delays, may not have their ballots counted.

### F. Previous Action: *Democracy NC v. North Carolina State Board of Elections*

On May 22, 2020, voting-rights groups and individual voters filed an action in the U.S. District

Court for the Middle District of North Carolina. *See Democracy North Carolina v. NC State Board of

Elections*, 2020 U.S. Dist. LEXIS 138492 (Aug. 4, 2020). In that action, plaintiffs challenged various

provisions of North Carolina election law, alleging that in the context of the COVID-19 pandemic, those

5

election law provisions infringe on their rights under federal law. Among the challenged provisions of North Carolina law are the witness requirement for mail-in absentee ballots and the restrictions on how absentee ballots can be returned to county boards of elections. The plaintiffs also sought procedures for curing deficiencies in returned absentee ballots. The court granted permissive intervention to Moore and Berger, the Legislator Plaintiffs in this action. The State Board Defendants vigorously defended against these claims.

On August 4, 2020, following a two-day evidentiary hearing and a third day of oral argument, the court ruled on plaintiffs' preliminary injunction motion. *Id* . In its 188-page opinion and order, the court largely denied the preliminary injunction. However, the court enjoined defendants "from the disallowance or rejection, or permitting the disallowance or rejection, of absentee ballots without due process as to those ballots with a material error that is subject to remediation," and directed the adoption of procedures "which provide[] a voter with notice and an opportunity to be heard before an absentee ballot with a material error subject to remediation is disallowed or rejected." *Id*. at *182. These changes were necessary, the court ruled, because North Carolina's witness requirement as statutorily authorized was likely unconstitutional. Thus, the court enjoined the State Defendants from "the disallowance or rejection . . . of absentee ballots without due process as to those ballots with a material error that is subject to remediation." *Id.* at 187. Further, the court concluded that "when the ballot is rejected for a reason that is curable, such as incomplete witness information, or a signature mismatch, and the voter is not given notice or an opportunity to be heard on this deficiency, the court finds this 'facially effect[s] a deprivation of the right to vote.'" *Id.* at 156. This "compelled" the court to find that the absentee-ballot statutes were "constitutionally inadequate" absent a statewide cure procedure. *Id.* at 157.

Though the court denied much of the requested relief, it noted that "Plaintiffs have raised genuine issues of concern with respect to the November General Election. Should Legislative and Executive Defendants believe these issues may now be discounted or disregarded for purposes of the impending election, they would be sorely mistaken." *Id*. at *4No party, including Legislative Defendants, . appealed.

To attempt to comply with this injunction and pursuant to its statutory authority under section 163-22.2, the State Board released guidance that allowed voters to cure voter signature defects but required a voter to re-vote her ballot for witness signature defects. Soon thereafter, the State Board became concerned that the cure mechanism did not provide sufficient notice or opportunity to be heard on witness signature defects and that it disparately affected the rights of certain groups of voters, thereby giving rise to the risk of additional litigation that would hamper an orderly election process.

As a result, and in a good-faith effort to ensure full compliance with the injunction while also complying with other legal obligations, the State Board directed county boards not to disapprove any ballots until a new cure procedure that would comply with the State Defendants' understanding the injunction could be implemented. On September 22, 2020, the State Board instituted the cure procedure attached to the proposed consent judgment. The State Board subsequently notified the federal court of its cure mechanism process.

### G. State Court Action: *North Carolina Alliance for Retired Americans v. North Carolina State Board of Elections*

On August 10, 2020, the North Carolina Alliance for Retired Americans, with several individual voters, filed an action in Wake Superior Court. Plaintiffs challenge: (1) limitations on the number of hours and days that counties can offer one-stop in-person absentee voting; (2) the witness requirement for mail-in ballots; (3) the lack of pre-paid postage for mail-in absentee ballot return envelopes; (4) rejection of mail-in absentee ballots that are postmarked by Election Day but delivered to county boards more than three days after the election, given concerns over delivery delays and operational difficulties with the United States Postal Service; (5) rejection of absentee mail-in ballots due when the voters signature does not match the signature on file with a board of elections; and (6) restrictions on assistance with requesting a returning mail-in absentee ballots. On August 18, 2020, plaintiffs moved for a preliminary injunction.

On August 12, 2020, the Legislative Defendants filed a notice of intervention as of right in the *NC Alliance* action. That intervention as of right was effected by the filing of the notice, and they are now

7

parties to that action as intervenor-defendants on behalf of the General Assembly. *See* N.C. Gen. Stat. §§ 1-72.2 and 1A-1, Rule 24(c).

## H.     State Board's Unanimous Bipartisan Decision to Resolve These Cases

On September 15, 2020, the State Board met to discuss with agency counsel and counsel at the North Carolina Department of Justice a strategy to resolve these cases. Because the conversation was protected by the attorney-client privilege, the Board members met with their attorneys in closed session. After lengthy discussion,  the Board voted unanimously to propose an offer of settlement.

Eight days later, on September 23, after the joint motion for entry of a consent judgment became public, the two Republican members of the Board resigned. In their resignation letters, they suggested that counsel from the North Carolina Department of Justice had deceived them and they did not understand the vote they were taking. Ex. C. Records from the Board's meeting with counsel plainly belie those claims.

On September 25, the remaining Board members voted to waive attorney-client privilege as to the meeting minutes and preparation materials, including memoranda written by agency staff and outside counsel, explaining various options and opportunities for compromise. Ex. D.  The materials made clear that Counsel from the Attorney General's office had properly informed the Board of their options and had in no way deceived them.  Later that night, it became public that the North Carolina GOP had pressured the Republican members to  resign. Ex. E.

## I.     The Proposed Consent Judgment

On September 22, 2020, the *NC Alliance* plaintiffs and State Board defendants filed a Joint Motion for Entry of a Consent Judgment with the superior court. Under the proposed consent order, plaintiffs agreed to drop many of their demands, including expanded early voting, elimination of the witness requirement for mail-in absentee ballots, and pre-paid postage for mail-in absentee ballot return envelopes. The State Defendants agreed: (1) to extend the deadline for receipt of mail-in absentee ballots mailed on or before Election Day to nine (9 ) days after Election Day to match the UOCAVA deadline, in keeping with the guidance received on July 30, 2020 from the Postal Service; (2) implement the cure

process set forth in N.M. 2020-19, as revised; and (3) establish separate mail-in absentee ballot "drop off stations" staffed by county board officials at each early voting site and at each county board of elections to reduce the congestion and crowding at early voting sites and county board offices. Plaintiffs agreed to accept these measures, which fell far short of their demands, "as a full and final resolution of Plaintiffs' claims against Executive Defendants related to the conduct of the 2020 elections." The hearing on the joint motion is set for Friday.

## ARGUMENT

### I. Legal Standard

The same standards that apply to preliminary injunctions apply to a motions for a temporary restraining order. *See*, *e.g.*, *U.S. Dep't of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006). To obtain a TRO, the moving party must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs have the burden of proof on each factor. *Winter*, 555 U.S. at 20. Additionally, a plaintiff must show that success on the merits is likely "regardless of whether the balance of hardships weighs in his favor." *The Real Truth About Obama, Inc. v. F.E.C.*, 575 F.3d 342, 346 (4th Cir. 2010), *vacated on other grounds*, 559 U.S. 1089 (2010). This burden requires more than simply showing that "grave or serious questions are presented." *Id*. at 347. Like a preliminary injunction, a TRO is an "extraordinary remedy," and requires a showing of immediate threatened harm. *N.C. State Bd. of Dental Examiners v. FTC*, 2011 U.S. Dist. LEXIS 12696, *4 (E.D.N.C. 2011).

### II. Plaintiffs Have No Likelihood of Success on the Merits

Plaintiffs' claims have numerous jurisdictional and procedural infirmities—each of which is an independent ground for denying their motion for temporary restraining order.

#### A. Plaintiffs Lack Standing.

Standing requires that a party show an "invasion of a legally protected interests that is concrete and particularized and actual or imminent." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64

9

(1997). The injury must also be "fairly traceable to the challenged action" and "redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Prudential standing requires that a party "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004) (internal quotations omitted).

### 1. Plaintiffs Lack Prudential Standing.

The Legislators and candidate are not proper parties to raise the Elections Clause or the Equal Protection claims. The voters are not proper parties to raise the Elections Clause claim.

"[A] party may assert only a violation of its own rights." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988). A plaintiff ordinarily "cannot rest his claim to relief on the legal rights or interests of third parties." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984). Here, the plaintiffs claim that the N.M. "usurp the General Assembly's sole authority to prescribe the regulations governing federal elections in North Carolina" pursuant to the Elections Clause. Dkt. 1, ¶ 84. But none of the plaintiffs are the General Assembly.

The Elections Clause vests authority to prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives . . . in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. The term "Legislature" means the lawmaking functionaries of the state, including state legislatures and any other entities to which a state may delegate lawmaking authority, including courts. *Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 576 U.S. 787, 803 (2015). Accordingly, if the Elections Clause claim could be brought here, it would beis the General Assembly as an institutional plaintiff that may have standing. *Id.* at 803.

But none of the plaintiffs here are either the General Assembly or have been delegated lawmaking functions. The Legislators allege in their complaint that, as the "leader[s]" of the North Carolina legislative chambers, they "represent[] the institutional interests of th[ose] bod[ies] in this case." Dkt. 1, ¶¶ 7, 8. But the Legislators point to no authority—statutory or common law—that vests the right within the Speaker and President Pro Tem to represent their entire respective chambers in litigation of this

kind. *See also Raines*, 521 U.S. at 829 (noting that the plaintiffs "had not been authorized to represent their respective Houses of Congress").

The Legislators rely on N.C. Gen. Stat. § 1-72.2 and 120-32.6 for their claimed authority to "represent both the institutional interests of the General Assembly and the interest of the State as a whole in this litigation." Br. at 10. But their reliance on these statutes is misplaced. Both statutes only apply in actions "in which validity or constitutionality of an act of the General Assembly or a provision of the North Carolina Constitution is challenged." (N.C. Gen. Stat. §§ 1-72.2(a), (b); 120-32.6). Here, plaintiffs challenge only *executive* action. Accordingly, these statutes do not to grant them authority to represent the Legislature as a whole in this case.

Moreover, neither the Legislators nor the candidate can bring the Equal Protection Clause claim. The right to participate in elections on an equal basis is a right that belongs to the voter, not to legislators who bring their claims in their official capacity or as candidates for election. *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Therefore, neither the Legislators nor the candidate has standing to bring the Equal-Protection Claim.

### 2. Plaintiffs' Claims Are Not Ripe.

Plaintiffs' challenges to the constitutionality of N.M. 2020-22 and 2020-23 are not ripe. The ripeness doctrine prevents courts "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect agencies from judicial interference until an administration decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967). To determine ripeness, courts consider "whether resolution of the tendered issue is based upon events or determinations which may not occur as anticipated." *A/S J. Ludwig v. Tidewater Const. Co.*, 559 F.3d 928, 932 (4th Cir. 1977).

Plaintiffs seek to enjoin the State Board from "enforcing and distributing" N.M. 2020-22 and 2020-23. Dkt. 1 at 22. But the State Board has not issued those memos. They are the subjects of the proposed consent judgment in *NC Alliance*, which has not yet been entered. If the joint motion is granted

11

and the proposed consent decree is entered unchanged, the State Board will issue N.M. 2020-22 and 2020-23. But it is possible the court in *NC Alliance* will decline to enter the proposed order or make changes to its substance. The N.M. will not take effect until then.

For these reasons, plaintiffs' request that this Court rule on the State Board's authority to issue these N.M. is, as the Fourth Circuit in *Tidewater Construction Company* admonished, "based upon events or determinations which may not occur as anticipated."

### 3.      Plaintiffs Failed to State an Injury.

None of the plaintiffs can show injury from the N.M. To show injury-in-fact, a plaintiff must demonstrate that the injury is "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Environmental Servs.*, 528 U.S. 167, 180-81 (2000).

Initially, unless the court in *NC Alliance* enters the proposed consent decree, N.M. 2020-22 and 2020-23 will not go immediately into effect. As a result, none of the plaintiffs can claim that these N.M. are currently causing them any injury.

The Legislators separately argue that they are injured under the Elections Clause because they have an interest in "the validity of the duly-enacted laws" of North Carolina and a "prerogative to regulate the federal elections in North Carolina." Dkt. 1, ¶ 73. But under long-standing Supreme Court precedent, these types of injuries are institutional injuries—not ones borne by individual legislators. *See, e.g.*, *Raines v. Byrd*, 521 U.S. 811, 821, 829 (1997) (holding that individual members of Congress did not suffer an injury sufficient to challenge the Line Item Veto Act because it would dilute the efficacy of "all Members of Congress and both Houses . . . equally."). By contrast, only the legislature as a whole has the authority to assert an institutional injury. *Arizona Independent Redistricting Comm'n*, 576 U.S. at 802 (recognizing an injury when the Arizona Legislature as a whole asserted its institutional injury of forgoing authority to perform redistricting duties). Here, because the Legislators represent just two of the members of the General Assembly, they alone cannot assert any alleged institutional injury relating to the regulation of elections in North Carolina and the enactment of statutes.

12

Moreover, the Legislators and the candidate have not alleged any injury resulting from any perceived vote-dilution or uneven enforcement of laws.

Nor do the voters succeed. They assert two injuries: that the N.M. enforce different requirements on different voters and that the N.M. unlawfully "dilute" their votes. Even if the voters' claims were cognizable, the injuries they claim are not.

The N.M. do not enforce different requirements on different voters, but rather do the exact opposite. *See* N.M. 2020-19 ("County boards of elections must ensure that the votes of all eligible voters are counted using the same standards, regardless of the county in which the voter resides."). And N.M. 2020-22 and 2020-23 are not yet in effect. Therefore, the only State Board action that could have injured anyone now is the enforcement of N.M. 2020-19. But the voters have failed to show that implementation of N.M. 2020-19 has imposed different requirements *on them*.

N.M. 2020-19 provides a cure mechanism for voters to correct deficiencies in the completion of their absentee-ballot container envelopes. That memo does not get enforced unless an absentee voter makes errors when completing her container envelope and a cure is required. Both voters allege that they have already returned their ballots by mail and their ballots have been accepted. Dkt. 1, ¶¶ 9, 10. Accordingly, both voter-plaintiffs appear to have made no errors on their envelopes, avoiding triggering the memo's provisions. Therefore, it is impossible for the implementation and enforcement of the memo to have had any effect—much less injury—on either of the voter plaintiffs.

Moreover, the right that the voters seek to assert—that only properly marked ballots are counted—is possessed by every voter in North Carolina, and therefore does not rise to an injury incurred by any one particular voter. *See, e.g.*, *Hollingsworth v. Perry*, 570 U.S. 693, 705-06 (2013) (A litigant raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy); *Lance v. Coffman*, 549 U.S. 437, 439 (2007); *Lujan*, 504 U.S. at 575. The voter plaintiffs have not shown any particularized injury here.

13

### 4. Plaintiffs Seek Relief That Does Not Redress Their Alleged Harms.

Plaintiffs seek to enjoin the effect of N.M. 2020-19 "to the extent [it] overrule[s] the enactments of the General Assembly," including the witness requirement. But if this Court were to enjoin the implementation of N.M. 2020-19, the State would have no cure procedure in place at all. The State Board is currently enjoined from rejecting any ballots without providing a cure process so that voters may redress curable deficiencies. *Democracy NC*, Dkt. 124 at 187. Without N.M. 2020-19, the State Board would have no way of rejecting *any* absentee ballots, exacerbating plaintiffs' perceived injury resulting from an alleged elimination of the witness requirement. Plaintiffs "must seek relief that actually improves their position." *Townley v. Miller*, 722 F.3d 1128, 1134 (9th Cir. 2013). The relief Plaintiffs have requested here "worsen[s] plaintiffs' injury rather than redressing it." *Id.* at 1135.

An injunction against the ballot return procedure would have similar effect. The provision plaintiffs' object to—accepting ballots that cannot be verified as having been returned by the voter or the voter's near relative or guardian—is not a provision that was implemented for the first time here. N.M. 2020-23. Rule 08 NCAC 18 .0102 (effective Dec 2018) explicitly states that failure to confirm that an absentee ballot was returned by the voter or a voter's near relative or guardian "shall not constitute evidence sufficient in and of itself to establish that the voter did not lawfully vote his or her ballot." Enjoining the N.M., which only reiterates this preexisting rule and does not change it, therefore does not grant plaintiffs the relief they seek.

### B. Plaintiffs' Requested Relief Is Barred by the Anti-Injunction Act.

Plaintiffs' attempt to avoid litigating these issues in the first-filed state-court proceeding should be rejected. In that state-court case, the Legislators intervened to oppose the consent judgment, and ground their opposition in part on the same arguments they make here. *See* LDs' Opp to Joint Motion for Entry of a Consent Judgment, *NC Alliance for Retired Americans*, No. 20 CVS 8881. But rather than let those arguments be judged in the first instance by the state court in the proceedings in which they are relevant, they seek injunctive relief in federal court to prohibit the consent judgment from going into effect. "[A]n injunction to stay proceedings in a State court" would be barred by the Anti-Injunction Act.

14

28 U.S.C. § 2283. Plaintiffs should not be permitted to circumvent this rule by seeking to enjoin portions of a consent judgment that are currently under consideration in a separate state-court action.

The Anti-Injunction Act "is an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions." *Ackerman v. ExxonMobil Corp.*, 734 F.3d 237, 250 (4th Cir. 2013) (quoting *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 286 (1970)). Here, plaintiffs seek "preliminary and permanent injunction[s] enjoining Defendants from enforcing and distributing" each N.M. Complaint, Prayer for Relief (e)-(g). These proposed injunctions, directed at the party to a state-court action—an action in which the Legislative-Plaintiffs are also parties—and aiming to prohibit a certain outcome of that action, plainly fall within the scope of the Act. "An injunction issued *against parties* to a state court proceeding is, for purposes of the Act, considered an injunction to stay the state court proceeding itself." *In re MI Windows & Doors, Inc., Prods. Liability Litig.*, 860 F.3d 218, 224 (4th Cir. 2017); *Atlantic Coast*, 398 U.S. at 287 ("the prohibition of [§] 2283 cannot be evaded by addressing the order to the parties").

Thus, the proposed injunction violates the Anti-Injunction Act unless it falls within one of the Act's three exceptions. *Ackerman*, 734 F.3d at 250. No exception applies here. The first exception applies "when [a federal] statute creates 'a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding." *Id.* (quoting *Mitchum v. Foster*, 407 U.S. 225, 237 (1972)). Plaintiffs portray their claims as emerging from civil rights violations under § 1983. But courts should not lightly use § 1983 to intervene in state-court proceedings. *See, e.g.*, *Hawaii Housing Auth. v. Midkiff*, 463 U.S. 1323, 1325 (1983) (Rehnquist, J.) ("Where vital state interests are involved, a federal court should refrain from enjoining an on-going state judicial proceeding unless state law clearly bars the interposition of constitutional claims, or some extraordinary circumstance exists requiring equitable relief."). Also, because plaintiffs do not have standing to assert their claims, there is no § 1983 action properly before this Court. The "expressly authorized" exception to the Act does not apply. *See Atlantic Coast Line*, 398 U.S. at 297 ("Any doubts as to the propriety of a federal injunction against state court proceedings should

15

be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy.").

The "necessary in aid of its jurisdiction" exception "is widely understood to apply most often when a federal court was the first in obtaining jurisdiction over a *res* in an *in rem* action and the federal court seeks to enjoin suits in state courts involving the same *res*." *In re Am. Honda Motor Co., Inc., Dealerships Relations Litig.*, 315 F.3d 417, 439 (2003). The third exception, "to protect or effectuate [a federal court's] judgments," or the "relitigation exception," "was designed to permit a federal court to prevent state court litigation of an issue that previously was presented to and decided by the federal court." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147 (1988). Plainly, neither exception is relevant here. .

### C.    This Court Should Abstain From Issues Litigated in State Court.

Plaintiffs' constitutional claims each turn on the alleged illegality under state law of the N.M. that are part of the proposed consent judgment. *See* Complaint ¶ 84-85, 93. As a result, well-settled principles of abstention counsel against this Court deciding those claims. If the Court were to decide plaintiffs' motion before the state court ruled on the proposed consent judgment, its decision would either be rendered advisory by a state court decision rejecting the consent judgment, or it would risk intruding on the state courts' construction of state law in approving the consent judgment. On the other hand, if the Court were to reach the merits of plaintiffs' motion *after* the state court issues its decision, it would risk allowing itself to impermissibly serve as a forum to appeal that decision, in violation of the *Rooker-Feldman* doctrine. The Court should decline plaintiffs' request to ignore these important principles of federalism and comity.

### 1.    If This Motion is Decided Before the Entry of a Consent Decree, This Lawsuit Is Jurisdictionally Barred.

"*Pullman* abstention . . . is appropriate where there are unsettled questions of state law that may dispose of the case and avoid the need for deciding the constitutional question." *Meredith v. Talbot Cty., Md.*, 828 F.2d 228, 231 (4th Cir. 1987). Application of the *Pullman* doctrine requires: "(1) an unclear

16

issue of state law presented for decision, (2) the resolution of which may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive." *Educ. Servs., Inc. v. Md. State Bd. for Higher Educ.*, 710 F.2d 170, 174 (4th Cir. 1983); *see also NC RSOL v. Boone*, 402 F. Supp. 3d 240, 257 (M.D.N.C. 2019). "*Pullman* abstention serves two primary goals: (1) avoiding constitutional questions when their resolution is unnecessary, and (2) allowing state courts to decide issues of state law." *Nivens v. Gilchrist*, 444 F.3d 237, 246 n.6 (4th Cir. 2006). Both of the requirements for abstention are presented here, and abstention would achieve the doctrine's two goals.

First, plaintiffs' claims plainly implicate unsettled issues of state law. Plaintiffs have requested that this court enter an order "prohibiting Defendants from enforcing and distributing the Numbered Memoranda at issue in this case." Mot. at 1. As they acknowledge, the N.M. are tied to and a part of a potential settlement that the Board has reached in a state court action. *See* Complaint ¶ 53; Br. at 6. The Legislators are particularly aware of this fact because they have intervened in that action to oppose the consent judgment. *See* Complaint ¶ 51; LDs' Opp. to Joint Motion for Entry of a Consent Judgment, *NC Alliance for Retired Americans v. NC State Bd. of Elections*, No. 20 CVS 8881. In their opposition to the entry of the consent judgment, the Legislators argue: (1) that the consent judgment cannot be entered because "Legislative Defendants are necessary parties to any consent judgment," (2) the state court does not have jurisdiction under state law to enter the consent judgment, (3) the consent judgment is collusive, (4) the consent judgment violates the federal constitution, (5) the consent judgment is not "fair, adequate, and reasonable," and (6) the consent judgment is against the public interest. *Id.*

Thus, by the Legislators' count, there are no less than five adequate and independent state-law reasons for the state court to reject the proposed consent judgment. The state court's acceptance of *any* one of those reasons—and consequent rejection of the consent judgment—would moot this case. That is, "the resolution of [these issues] may moot or present in a different posture the federal constitutional issue such that the state law issue is 'potentially dispositive.'" *Educ. Servs., Inc. v. Md. State Bd. for Higher Educ.*, 710 F.2d at 174. But approval of the consent judgment would also significantly change the posture of the federal constitutional questions in this case. Approval of the consent judgment would necessarily

17

entail a finding that the Board has the delegated authority under state law to make the changes in the N.M. The state court's conclusion on that point would be dispositive as to plaintiffs' Election Clause claim in this case.

Federal courts faced with similar situations have repeatedly made the decision to abstain, or else have been instructed by the Courts of Appeals to do so. For example, Texas's vote-by-mail rules have been challenged in both state and federal court, and those lawsuits have sought injunctive relief barring enforcement of those rules. *See Texas Democratic Party v. Abbott*, 961 F.3d 389, 394-96 (5th Cir. 2020). While the state-court litigation was pending, the Western District of Texas granted a preliminary injunction that would allow every Texas voter to vote by mail. *Id.* The Fifth Circuit stayed the injunction, criticizing the district court's decision to rule "without waiting . . . for the Texas Supreme Court to interpret its own state's election law." *Id.* at 396. "The district court's decision to forge ahead despite an intimately intertwined—and, at that time, unresolved—state-law issue was not well considered." *Id.* at 397 n.13.

In *Trump for President, Inc. v. Boockvar*, 2020 WL 4920952 (W.D. Pa. Aug. 23, 2020), plaintiffs argued that Pennsylvania's Secretary of the Commonwealth's recent implementation of a mail-in voting plan violated "the Pennsylvania election code and violate[s] their rights under the federal and state constitutions." *Id.* at *2. Those claims also included Elections Clause and Equal Protection Clause violations. *Id.* at *9. As is the case here, "Plaintiffs' federal-constitutional claims hinge on violations of the [state] election code." *Id.*; *see* Complaint ¶ 84, 85 (premising Elections Clause claim on violation of state law), 93 (premising Equal Protection Clause claim on argument that the N.M. "ensure[] the counting of votes that are invalid under" state law). The court concluded that *Pullman* abstention was appropriate because "a state court could simply decide whether Defendants' conduct violates the election code and, if it does, enjoin it on that basis." *Id.* at *2. "Conversely, a state-court finding that Secretary Boockvar's guidance was lawful could defeat, or at least play a critical role in the Court's analysis of, Plaintiffs' constitutional claims . . . ." *Id.* Thus the Court concluded that "the important principles underlying the *Pullman* abstention doctrine—federalism, comity, constitutional avoidance, error prevention, and judicial

18

efficiency—all weigh strongly in favor of letting state court decides predicate disputes about the meaning of Pennsylvania's state election code." *Id.*[1]

Those same principles counsel abstention here. The doctrine of constitutional avoidance is "more deeply rooted than any other [doctrine] in the process of constitutional adjudication." *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944). If this Court were to wade into the merits of Plaintiffs' claims prior to the state court decision, it risks issuing what may ultimately be an advisory opinion on an important question of constitutional law. As federal courts across the country have recognized when faced with similar circumstances, the better course is to abstain.

### 2. If This Court Rules After the Entry of a Consent Decree, This Lawsuit Is Still Jurisdictionally Barred.

Waiting for the state court to issue its judgment before reaching the merits of plaintiffs' claims does not avoid the troublesome intrusions on federalism and comity presented by plaintiffs' complaint. Rather, the courts of the state of North Carolina should be allowed to definitively adjudicate the state-law predicates of plaintiffs' federal constitutional claims. If this Court were to proceed to adjudicate plaintiffs' claims after a state court upheld the consent judgment, it would be, in function, serving as a forum for the plaintiffs to appeal that state court decision.[2] This would run afoul of the bedrock principle, expressed through the *Rooker-Feldman* and *Pennzoil* doctrines.

Under *Rooker-Feldman*, suits that "essentially invite[] federal courts of first instance to review and reverse unfavorable state court judgments" must be "dismissed for lack of subject-matter

---

[1] *See also Moore v. Hosemann*, 591 F.3d 741, 744-45 (5th Cir. 2009) (reversing district court's conclusion that candidate's constitutional challenge to filing deadline was moot after election occurred but remanding "urg[ing] the district court to consider whether to abstain" under the *Pullman* doctrine because an adverse ruling would dispose of any federal constitutional question); *Burdick v. Takushi*, 846 F.2d 587, 88-89 (1988) (reversing district court's grant of summary judgment for plaintiff regarding Hawaii's prohibition on write-in voting and concluding *Pullman* abstention was appropriate because it was unclear whether Hawaii actually did prohibit write-in voting and that a state court decision finding that it did not would obviate the federal claim); *Fuente v. Cortes*, 207 F. Supp. 3d 441, 449-50 (M.D. Pa. 2016) (abstaining from plaintiff's challenge to his exclusion from ballot as an independent candidate because of unsettled underlying issue as to whether his exclusion was proper under state law).

[2] Plainly, if the state court were to reject the consent judgment, Plaintiffs' complaint would be moot. This section therefore assumes that the state court approves the consent judgment.

jurisdiction." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283-84 (2005); *see also* 28 U.S.C. § 1257. Courts examine "whether the state-court loser who files suit in federal district court seeks redress for an injury caused by the state-court decision itself." *Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 718 (4th Cir. 2006); *see also Howell v. Wilson*, No. 3:15-cv-2561, 2015 WL 7272185, at *2 (D.S.C. Nov. 13, 2015) ("After *Exxon*, the proper inquiry examines the source of the plaintiff's injury: if the state court judgment caused the plaintiff's injury, the claim is barred, but a claim alleging another source of injury is an independent claim.").

The N.M. will be effective if, and only if, the consent judgment is approved by the state court. Therefore, to the extent that plaintiffs are injured by the changes made in the N.M., they will be injured by the state court's approval and entry of the consent judgment. Thus, plaintiffs seek relief in this court from a state court order. *See Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 88 (2d Cir. 2005) ("Where a state-court judgment causes the challenged third-party action, any challenge to that third-party action is necessarily the kind of challenge to the state court judgment that only the Supreme Court can hear."). Additionally, plaintiffs have also pressed their federal constitutional claims in the state court proceeding. *See* LDs Opp to Joint Motion for Entry of a Consent Judgment, *NC Alliance for Retired Americans v. NC State Bd. of Elections*, No. 20 CVS 8881. As a consequence, any ruling in plaintiffs' favor would necessarily "reverse or modify the state court decree." *See McGee v. N.C. State Bar*, No. 5:12-cv-227, 2012 WL 5993758, at *2 (quoting *Adkins v. Rumsfeld*, 464 F.3d 456, 464 (4th Cir. 2006)). This route is barred by *Rooker-Feldman*.

Similarly, plaintiffs' claims would also be barred by the *Pennzoil v. Texaco* doctrine. In *Pennzoil*, the Supreme Court rejected Texaco's attempt to enjoin the enforcement of a state court injunction after it had lost in that forum. 481 U.S. 1, 14 (1987). The Supreme Court held that "federal injunctions" may not be used to "interfere with the execution of state judgments," particularly where the federal lawsuit "challenge[s] the very process by which [the state court] judgments were obtained" and the federal constitutional claim could have been raised in the state court action. *Id.* at 14-16.

20

*Pennzoil* would foreclose the relief plaintiffs seek here. If this Court were to enjoin the memoranda, it would be invalidating the basis of a state-court judgment. This is particularly true given that the Legislators are defendants in the state-court action and raised the same federal claims in that case. The proper forum for the constitutional challenges raised here would be in the state court itself.

> **D.  Plaintiffs' Elections Clause Claim Is Meritless.**

> **1.  The Merits of Plaintiffs' Elections Clause Claim Turn on State Law**

The Elections Clause states, in relevant part, that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. Plaintiffs assert that this Clause empowers "only two entities" to regulate elections in North Carolina:  Congress and the North Carolina General Assembly. Br. at 11; *see also id.* at 12 (contending that "[b]y choosing to use the word 'Legislature,' the Elections Clause makes clear that the Constitution . . . grant[s] the power to regulate elections . . . to the state's legislative branch" alone). Under binding Supreme Court precedent, plaintiffs' interpretation of the Elections Clause is plainly wrong.

More than a century ago, the Supreme Court made clear that the word "Legislature" in the Elections Clause should not be read as a reference to "the representative body alone." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n ("AIRC")*, 576 U.S. 787, 805 (2015) (describing the holding in *Davis v. Hildebrant*, 241 U.S. 565 (1916)). In that case, *Davis v. Hildebrant*, the Court considered whether the State of Ohio could constitutionally submit state redistricting laws to residents of Ohio for approval or disapproval by popular vote.  241 U.S. at 566.  The *Hildebrant* plaintiffs had argued that, because the Elections Clause commits elections to "the Legislature," the populace could not constitutionally be involved in lawmaking related to elections.  *Id.* at 567.  The Supreme Court disagreed. Because, under Ohio law, popular referenda "were a part of the legislative power of the state," the Court held that they fell within the scope of the Elections Clause.  *Id.*

The Supreme Court has repeatedly affirmed this interpretation of the Elections Clause, including as recently as 2015. *E.g.*, *AIRC* , 576 U.S. 787; *Smiley v. Holm*, 285 U.S. 355 (1932). *Arizona*

21

*Independent Redistricting Commission*, assessed the constitutionality of a redistricting commission that had been created as part of an initiative ratified by Arizona voters. 285 U.S. at 792. After the commission adopted new redistricting maps, the Arizona Legislature sued, arguing that the commission had usurped its authority under the Elections Clause. In the Legislature's view, the Clause's use of the word "Legislature" "mean[t] specifically and only the representative body which makes the laws of the people." *Id.* (citation omitted). The Arizona Legislature thus maintained that the Commission—and the maps that it had drawn—were unconstitutional.

The Supreme Court rejected this narrow reading of the Elections Clause. *Id.* at 814-24. At the time of the Founding, the Court explained, the word "legislature" was "capaciously define[d]." *Id.* at 813 (citing several Founding-era dictionaries). The "meaning of the word 'legislature'"—a word "used several times in the Federal Constitution"—therefore "differs" based on the context in which it is used. *Id.* at 808 (quoting *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 434 (1932)) (alteration omitted).

For purposes of the Elections Clause, the Court said, the word "Legislature" must be interpreted "in accordance with the [relevant] State's prescriptions for lawmaking." *Id.* For example, if state law requires that elections laws be passed by a General Assembly subject to the Governor's veto, "the Elections Clause . . . respect[s] the State's choice to include the Governor" in the legislative process. *Id.* at 807; *see also Smiley*, 285 U.S. at 368, 372-73. If, instead, state law "place[s] the lead rein in the people hands" to oversee elections-related lawmaking, then the "Legislature" should be read to include them. *AIRC*, 576 U.S. at 816.

Applying *Arizona Independent Redistricting Commission* and the many precedents like it, this Court cannot simply assume—as plaintiffs urge—that the North Carolina General Assembly is the "Legislature" that the Elections Clause references.   *E.g.*, Br. at 11 ("The General Assembly is the 'Legislature' . . . ."); *id.* at 12-13, 15 ("[T]he Elections Clause . . . grant[s] the power to regulate elections . . . only to the state's legislative branch."); *see also AIRC*, 576 U.S. at 805, 808-09, 816; *Hildebrant*, 241 U.S. 565; *Smiley*, 285 U.S. at 368. Instead, this Court must look to North Carolina law to determine who

the State authorizes to regulate elections. *See Smiley*, 285 U.S. at 368 (question of who has the "authority [to] mak[e] laws for the state" is a "matter of state polity").

### 2. Because Plaintiffs' Claim Turns on State Law, It Is Barred by Sovereign Immunity

Because the merits of plaintiffs' Elections Clause claim turn on a question of state law, this Court lacks jurisdiction to consider the claim. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 124-25 (1984) ("[T]he federal courts lack[ ] jurisdiction to enjoin . . . state officials on the basis of . . . state law."). "[S]overeign immunity . . . bars a court's grant of any type of relief . . . based upon a State official's violation of State law." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 293 (4th Cir. 2001); *see also Pennhurst*, 465 U.S. at 106, 124-25. Indeed, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. 89, 106.

Plaintiffs' Elections Clause claim flouts this clear rule. At bottom, plaintiffs are accusing the State Board of violating state law, which, they say, appoints the General Assembly as the sole regulator of federal elections. *See* Complaint ¶¶ 1-2, 18-19, 79; *see also* Br. at 1-2, 11-12, 14-16 (same). In other words, this Court can find an Elections Clause violation only if it first concludes that the State Board exceeded the authority it enjoys under state law. Any injunction this Court enters against the State Board therefore "contravenes the Eleventh Amendment." *Pennhurst*, 456 U.S. at 117; *see also id.* at 106 ("A federal court's grant of relief against state officials on the basis of state law . . . conflicts directly with the principles of federalism that underlie the Eleventh Amendment.").

### 3. State Law Plainly Authorizes the Board's Proposed Actions

Even if this Court had subject-matter jurisdiction, plaintiffs' Elections claim would fail on the merits. The Board's actions here violate the Elections Clause only if they are inconsistent with "the method which the State has prescribed" for enacting elections regulations. *AIRC*, 567 U.S. at 807 (quoting *Smiley*, 285 U.S. at 367); *see supra* Part II.D.1. But they are not. Instead, all three challenged memoranda are consistent with the State Board's authority under state law.

23

As an initial matter, under North Carolina law, the General Assembly has expressly delegated substantial authority over the conduct of elections to the State Board. Indeed, the General Statutes authorize the State Board to "supervis[e]" elections in the State and "to make such reasonable rules and regulations with respect to the conduct of . . . elections as it may deem advisable so long as they do not conflict with any provisions of this Chapter." N.C. Gen. Stat. § 163-22(a). Pursuant to this authority, the State Board makes a wide range of "interstitial policy decisions" that govern the "Time[ ], Place[ ], and Manner" of federal elections in the State—"including, but not limited to, . . . the number and location of the early voting sites to be established in each county and the number of hours during which early voting will be allowed at each site;" the requirements that voting systems must fulfill; and the guidelines for conducting a recount. *Cooper v. Berger*, 809 S.E.2d 98, 112 n.11 (N.C. 2018); 08 N.C. Admin. Code 04.0301 (voting-system requirements); 08 N.C. Admin. Code 09.0106 (recounts).

In addition to this general authority, state law also specifically empowers the State Board to regulate elections on an emergency basis in certain contexts: First, when one or more of North Carolina's election laws are "held unconstitutional or invalid," the Board has the "authority to make reasonable interim rules and regulations with respect to the pending . . . election as it deems advisable." N.C. Gen. Stat. § 163-22.2. Second, the Board is "authorized, upon recommendation of the Attorney General, to enter into agreement with the courts in lieu of protracted litigation until such time as the General Assembly convenes." *Id.* This authorizes the State Board to enter into a settlement agreement when a legal challenge to one of the State's election laws or other regulations threatens to disrupt an impending election. Third, the Board's Executive Director "may exercise emergency powers . . . where the normal schedule for the election is disrupted by" a "natural disaster," "[e]xtremely inclement weather," or "[a]n armed conflict." *Id.* § 163-27.1. "[N]atural disaster," in turn, is defined to include, among other things, hurricanes, tornadoes, and "[c]atastrophe[s] arising from natural causes" that "result[ ] in a disaster declaration by the President . . . or the Governor." 08 N.C. Admin. Code 01.0106.

Together, these laws make plain that the word "Legislature" in the Elections Clause, interpreted in accordance with the Supreme Court's direction, does not consist of the General Assembly alone. In

North Carolina, the State Board is clearly an integral source of "legislative authority" delegated from the General Assembly. *See AIRC*, 576 U.S. at 805 (quoting *Hildebrant*, 241 U.S. at 567); *see also, e.g.*, N.C. Gen. Stat. §§ 163-22(a), 163-22.2, 27.1; *Cooper v. Berger*, 809 S.E.2d 98, 112 n.11 (N.C. 2018).

All three of the challenged memoranda are consistent with this legislative framework and fall comfortably within the scope of the Board's authority.

First, all three memoranda arise out of a consent judgment proposed in response to a lawsuit filed in state court seven weeks ago. *NC Alliance*, No. 20-CVS-8881. As discussed above, the plaintiffs in that suit challenged a range of election laws as violating the North Carolina Constitution, including a range of laws that remain unaffected by the proposed consent judgment.. To avoid "protracted litigation"—at a time when voters are in desperate need of clarity—the State Board made the considered decision to enter into a consent agreement settling all of these claims. *See* N.C. Gen. Stat. § 163-22.2. A decision of that kind is expressly authorized under state law. *Id.*

Second, N.M. 2020-19, which implements a cure mechanism, sets forth "reasonable interim rules and regulations" in the wake of a constitutional challenge to the State's elections regime. *See* N.C. Gen. Stat. § 163-22.2. On August 4, 2020, a district court held that North Carolina's absentee-ballot laws failed to afford voters procedural due process because voters lacked "any notice of, or opportunities to cure, material defects in . . . th[eir] absentee ballots." *Democracy NC v. N.C. State Bd. of Elecs.*, 2020 U.S. Dist. LEXIS 138492 (Aug. 4, 2020). Accordingly, the court enjoined the State Board from allowing any absentee ballots to be rejected "without due process." *Id.* at 187. Based in part on their good-faith effort to comply with the Board's understanding of the injunction, the State Board instituted the cure procedure set forth in N.M. 2020-19. The "reasonable interim rules and regulations" set forth in N.M. 2020-19 thus fall under the Board's authority under N.C. Gen. Stat. § 163-22.2.

Third, the rules established in the N.M. would be independently authorized pursuant to the Executive Director's emergency authority under § 163-27.1(a)(1). North Carolina law permits the Director to modify the State's elections framework following a "natural disaster," including a "[c]atastrophe arising from natural causes [that has] resulted in a disaster declaration by the President . . .

25

or the Governor." *Id.*; 08 N.C. Admin. Code 01.0106(b). Here, North Carolina is operating under emergency declarations issued by the President and the Governor as the result of a pandemic. As a result, state law authorizes the Executive Director to implement the "remedial measures" set forth in the N.M., if she concludes that they are necessary in light of the factors listed in 08 N.C. Admin. Code 01.0106(c). Plaintiffs would have this Court believe that it violates the Elections Clause for the State Board to agree in a consent judgment to modifications to the State's elections procedures that state law, as enacted by the General Assembly, authorizes the Executive Director to implement. Plaintiffs' contention lacks merit.

Plaintiffs dispute this understanding of the Board's authority because, they say, the rules set forth in the N.M. "conflict with provisions enacted by the General Assembly." Br. at 15. Plaintiffs are wrong as a matter of North Carolina law. Section 163-27.1, the statute empowering the Executive Director to exercise emergency powers asks the Director to "avoid unnecessary conflict with" the State's other election laws. Inherent in this command is an implicit acknowledgement that tension between an emergency rule and a General Statute is lawful and expected. Similarly, the portion of § 163-22.2 that empowers the Board to "enter into agreement with the courts in lieu of protracted litigation" does not forbid the Board from entering any agreement that deviates from the election rules set out in other statutes. Section 163-22.2, after all, authorizes the Board to respond when the State's election laws are the target of litigation. In enacting that authorization, the General Assembly surely did not contemplate that consent judgments would require total surrender by plaintiffs, leaving in place the default rules that had been the impetus for the lawsuit in the first place.

In sum, because all of the rules set forth in the N.M. were imposed consistent with the authority afforded the State Board under state law, they do not violate the Elections Clause.

### E.     Plaintiffs' Equal Protection Claim Is Meritless.

Plaintiffs are similarly unlikely to succeed on their equal-protection claim. That claim is premised on two primary arguments, both of which lack merit.

First, plaintiffs argue that the N.M. will give rise to "arbitrary" and "nonuniform rules that will result in the unequal evaluation of ballots." Br. at 17. But even plaintiffs' own allegations cannot support

this argument. The entire purpose of the consent judgment is to ensure uniformity and consistency with the election just weeks away. Consistent with that purpose, the consent judgment would impose clear rules that would apply to any mail-in absentee ballot cast in North Carolina as part of the November 2020 election. Not surprisingly, then, plaintiffs have not identified any rules in the N.M. that will apply to some voters, but not to others. Nor have they identified any that are likely to be enforced against some voters, but not others.

To the contrary, *all* of North Carolina's election rules—including those set forth in the N.M.— will apply uniformly to all voters: *All* voters whose mail-in ballots are postmarked by Election Day and received within nine days can have their votes counted. *See* N.M. 2020-22. *All* voters who wish to vote via mail-in absentee ballot must comply with the State's witness requirement. 2020 N.C. Sess. Laws 2020-17, § 1.(a). *All* voters who wish to submit a mail-in absentee ballot in person may do so, so long as the individual dropping off the ballot provides the information required for the written log. *See* N.M. 2020-23. And *all* voters who return a mail-in absentee ballot with a curable deficiency can remedy that deficiency by way of a certification. *See* N.M. 2020-19. Plaintiffs' complaint does not allege otherwise with respect to any of these rules, a fact that dooms their equal-protection claim to the extent it relies on arbitrary treatment.

Plaintiffs' second equal-protection theory is grounded in the idea that the N.M. dilute their votes. *See* Br. at 20. According to plaintiffs, the N.M. will allow invalid votes to be counted, thereby "promot[ing] fraud and dilut[ing] the . . . weight of lawful voters." *Id.* The problems with this argument are manifold.

First, like plaintiffs' Elections Clause claim, their vote-dilution argument is barred by sovereign immunity. A key premise underlying plaintiffs' voter-dilution theory is that the N.M. violate state law and thus enables unlawful votes. But, as discussed above, *Pennhurst* bars this Court from enjoining state officials based on an alleged violation of state law. *Pennhurst*, 465 U.S. at 106, 124-25; *see supra* Part II.D.2.

Second, although vote dilution can serve as the basis for an equal-protection claim, Plaintiffs' theory is fundamentally incompatible with the nature of such a claim. "[A] vote dilution claim alleges that the State has enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential'" of a particular group. *Miller v. Johnson*, 515 U.S. 900, 911 (1995); *see also Reynolds v. Sims*, 377 U.S. 533, 568 (1964). In other words, a successful voter-dilution claim must prove that the State failed to afford the votes of one group of voters "the same weight as th[ose] of other voters." *Hadley v. Junior College Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 53 (1970). Plaintiffs' complaint alleges no such thing—and understandably so. The N.M. represent the State's best effort to protect North Carolinians' right to vote, notwithstanding a global pandemic. Plaintiffs offer no evidence whatsoever that the intent of the Memoranda was to devalue the votes of one group of lawful voters vis-à-vis another.

Instead, plaintiffs' voter-dilution argument amounts to nothing more than rank speculation about the prospect of voter fraud. *See* Br. at 20. Much as plaintiffs may wish otherwise, "[t]he Constitution is not an election fraud statute." *Bodine v. Elkhart Cnty. Election Bd.*, 788 F.2d 1270, 1271 (7th Cir. 1986). Plaintiffs thus cannot conjure up an equal-protection claim by advancing entirely unfounded theories about how voter fraud might water down the weight of lawful votes. For these reasons, plaintiffs' equal-protection claim, too, lacks merit.

### III.    Plaintiffs Cannot Establish Irreparable Harm.

The second *Winter* factor requires that plaintiffs demonstrate they will suffer irreparable harm if an injunction is not issued. *Winter*, 555 U.S. at 20. In *Winter*, the Supreme Court noted that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (internal citations and quotations omitted). Plaintiffs have failed to make this showing.

As already noted, plaintiffs have failed to adequately allege a cognizable injury at all, much less irreparable harm from such an injury. *See supra* pp. 12-14. Two of the three challenged N.M. have not gone into effect and will not go into effect unless the state court enters the consent judgment. Moreover,

28

the Legislators-Plaintiffs have failed to demonstrate harm because, as again already shown, only the General Assembly can assert that interest, and the Legislators are but two members of the 170-member General Assembly. *See, e.g.*, *Raines v. Byrd*, 521 U.S. 811 at 829. In addition, the voter-plaintiffs cannot show that the challenged N.M. enforce different requirements on different voters or dilute the voters' votes, let alone do so in any way that causes them harm. *See supra* pp. 27-29.

Finally, as explained above, to the extent Plaintiffs' claimed injuries are real and not illusory, they are the result of the statutory electoral scheme enacted by the General Assembly—a statutory scheme that Plaintiffs have not challenged on any grounds. Plaintiffs have therefore failed to show any harm at all, much less irreparable harm. *See supra* pp. 12-14.

## IV. The Balance of the Equities and Public Interest Weigh Against a TRO.

The final two *Winter* factors require plaintiffs to demonstrate that the equities tip in their favor and that an injunction is in the public interest. *Winter*, 555 U.S. at 20. In cases involving significant public interest, which unquestionably includes cases involving the conduct of elections, courts may "consider the balance of the equities and the public interest factors together." Courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Plaintiffs have not met and cannot meet these final two factors.

Again, plaintiffs have failed to show any injury or harm at all; and so the balance of harms tips decidedly away from them and in favor of the officials who are charged with administering North Carolina's election laws and who are doing so in clear conformity with those laws. Those laws include laws that authorize the State Board to avoid protracted litigation and enter into consent judgments "until such time as the General Assembly convenes" and that authorize the Executive Director to institute emergency orders during a state or national disaster. Defendants therefore represent the public interest in this case. Defendants have exercised these authorities in an attempt to ensure the orderly administration of an election, despite a flurry of lawsuits filed amid a global pandemic. These efforts reflect the public interest. "Because state officials are the parties against whom the injunction is sought, and they represent

29

the public interest, consideration of the harm to them should the injunction issue merges with consideration of the public interest." *Jackson v. Leake*, 476 F. Supp. 2d 515, 530 (E.D.N.C. 2006).

Defendants and the public unquestionably share a common interest here: the safe, secure and orderly administration of the election in accordance with North Carolina law. Plaintiffs here essentially claim harm, and harm that tips in their favor, unless only portions of North Carolina's election laws are recognized and enforced. Their claims of harm rest on ignoring the authority to administer elections that the General Assembly has conferred on the State Board and its Executive Director, as recognized by the North Carolina Supreme Court. *See Cooper v. Berger*, 809 S.E.2d 98. Simply put, Plaintiffs have failed to adequately allege cognizable injuries or harms that can be remedied. There are no harms to tip the balance their direction at all.

## CONCLUSION

For the foregoing reasons, the State Defendants respectfully request that the Court deny plaintiffs' motion for a temporary restraining order.

This the 1st day of October, 2020.

JOSHUA H. STEIN
Attorney General

/s/ Alexander McC. Peters
Alexander McC. Peters
N.C. State Bar No. 13654
Chief Deputy Attorney General
N.C. Dept. of Justice
Post Office Box 629
Raleigh, NC 27602
Telephone: (919) 716-6900
Facsimile: (919) 716-6763
Email: apeters@ncdoj.gov
